**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DINA BAKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 4:19-cv-00189-SNLJ** |
| | ) | |
| **ANDREW M. SAUL,** | ) | |
| **Commissioner of the Social Security** | ) | |
| **Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM AND ORDER**

The Commissioner of the Social Security Administration denied plaintiff Dina Baker's applications for disability insurance benefits and supplemental security income benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq*. and Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq*. Baker now seeks judicial review. The Commissioner opposes the motion. The issues being fully briefed, and for the reasons set forth, this Court will **AFFIRM** the Commissioner's decision.

## I. Procedural History

Baker's application was denied at the initial determination level. She then appeared before an Administrative Law Judge ("ALJ"). The ALJ found Baker is not disabled because her symptoms were not supported by the medical evidence available. Baker then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration, which was denied. Thus, the decision of the ALJ stands as the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

Baker now seeks review by this Court pursuant to 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

## II.  Disability Determination—The Five-Step Framework

A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner follows a five-step sequential process when evaluating whether the claimant has a disability. 20 C.F.R. §§ 404.1520(a)(1), 416.920(a)(1). First, the Commissioner considers the claimant's work activity. If the claimant is engaged in substantial gainful activity, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see whether "the claimant has a severe impairment [that] significantly limits [the] claimant's physical or mental ability to do basic work activities." *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010); *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental

ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* 20 C.F.R. §§ 404.1520(c), 404.1520a(d), 416.920(c), 416.920a(d).

Third, if the claimant has a severe impairment, the Commissioner considers the impairment's medical severity. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), (d); 416.920(a)(4)(iii), (d).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, the Commissioner assesses whether the claimant retains the "residual functional capacity" (RFC) to perform his or her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(5)(i), 416.920(a)(4)(iv), 416.945(a)(5)(i). An RFC is "defined as what the claimant can still do despite his or her physical or mental limitations." *Gann v. Berryhill*, 864 F.3d 947, 951 (8th Cir. 2017); *see also* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). While an RFC must be based "on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations," an RFC is nonetheless an "administrative assessment"—not a medical assessment—and therefore "it is the responsibility of the ALJ, not a physician, to determine a claimant's RFC." *Boyd v. Colvin*, 831F.3d 1015, 1020 (8th Cir. 2016). Thus, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). Ultimately, the claimant is responsible for *providing* evidence relating to his RFC and the Commissioner is responsible for *developing* the claimant's

"complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). If, upon the findings of the ALJ, it is determined the claimant retains the RFC to perform past relevant work, he or she is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC does not allow the claimant to perform past relevant work, the burden of production to show the claimant maintains the RFC to perform work that exists in significant numbers in the national economy shifts to the Commissioner. *See Brock v. Astrue*, 574 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, the Commissioner finds the claimant not disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, the Commissioner finds the claimant disabled. *Id.* At Step Five, even though the *burden of production* shifts to the Commissioner, the *burden of persuasion* to prove disability remains on the claimant. *Hensley*, 829 F.3d at 932.

**III. The ALJ's Decision**

At Step One, the ALJ found Baker met the insured status requirements through September 30, 2019, and had not engaged in substantial gainful activity since November 5, 2015. (Tr. 16). At Step Two, the ALJ found Baker suffers from seven medically determinable impairments: (1) asthma; (2) chronic obstructive pulmonary disease

(COPD); (3) bipolar disorder; (4) borderline personality disorder; (5) panic disorder; (6) learning disability; and (7) attention deficit disorder (ADD). (Tr. 16). At Step Three, the ALJ concluded Baker does not have an impairment or combination of impairments that meets or equals one of the presumptively disabling impairments listed in the regulations. (Tr.17-18).

Next, in beginning the analysis of Step Four, the ALJ determined Baker's RFC.[1] The ALJ found that Baker

> has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: she could occasionally tolerate exposure to dust, odors, fumes, and pulmonary irritants. She was limited to performing simple, routine, and repetitive tasks. She could make simple work-related decisions. She could frequently interact with supervisors. She could occasionally interact with coworkers and the public.

(Tr. 18). As part of this determination, the ALJ found Baker's allegations about her physical and mental symptoms' intensity, persistence, and limiting effects were not consistent with the medical records when considered as a whole. (Tr. 19). Regarding Baker's respiratory impairments—asthma and COPD—the ALJ noted their stability with medication use, despite Baker's continued smoking. (Tr. 19). The ALJ mentioned that Baker, herself, said she was "doing well" as of July 27, 2017. (Tr. 19). Regarding Baker's mental impairments—bipolar, personality, panic, and attention deficit disorders along with a learning disability—the ALJ explained that some of these impairments' severity

[1] Determining claimant's RFC is "essential to properly completing steps four and five." *Swink v. Saul*, 931 F.3d 765, 769 (8th Cir. Jul. 29, 2019). However, the RFC is determined at step four—a point in which the burden of proof rests with claimant. *See Scott v. Berryhill,* 855 F.3d 853, 855 (8th Cir. 2017); *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005).

appeared situational, such as Baker's sudden suicidal ideations following an unfavorable decision by another ALJ related to social security disability benefits. (Tr. 19). It was also remarked that Baker, notwithstanding certain situational stressors, "had consistently normal mental status examination, including good judgment, cohesive thoughts, normal speech, and focused attention/concentration." (Tr. 19). The ALJ emphasized Baker apparently "required impatient treatment on [only] one occasion," but otherwise had a "great response to medication." (Tr. 19). Overall, the ALJ concluded neither physical nor mental impairments were of a severity greater than the limitations imposed in Baker's RFC. (Tr. 19).

Having made an RFC determination, the ALJ continued on through Step Four to determine whether Baker could perform her past relevant work in light of her designated RFC. The ALJ determined Al Rubaee has no past relevant work. (Tr. 21).

At Step Five, the ALJ analyzed whether Baker can successfully adjust to other work. The ALJ noted that if Baker could perform all or substantially all of the exertional demands at a given level under the Medical-Vocational Guidelines (the "Grids"), 20 C.F.R. Part 404, Subpart P, Appendix 2, then the Grids would direct a conclusion of whether Baker was "disabled" or "not disabled." The ALJ acknowledged, however, that additional limitations impede Baker's ability to perform work at all or substantially all exertional levels. Thus, the ALJ relied on vocational expert (VE) testimony to determine the extent to which these limitations erode Baker's occupational base to perform work at all exertional levels. The VE testified Baker could perform work as a machine feeder or small products assembler, even after considering all of the limitations in Baker's RFC.

(Tr. 22). The ALJ then found these jobs exist in significant numbers in the national economy and concluded Baker is not disabled. (Tr. 22).

## IV. Standard of Review

The Court must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. §§ 405(g); 1383(c)(3). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. Under this test, the court "consider[s] all evidence in the record, whether it supports or detracts from the ALJ's decision." *Reece v. Colvin*, 834 F.3d 904, 908 (8th Cir. 2016). The court "do[es] not reweigh the evidence presented to the ALJ" and will "defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." *Id*. The ALJ will not be "reverse[d] merely because substantial evidence also exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently." *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 370 (8th Cir. 2016).

## V. Discussion

Baker seeks remand on three issues. First, she says the ALJ erred by giving only "little weight" to the opinions of her treating physician, Dr. Ahmad Ardekani. Second, she says there is "no medical evidence to support the ALJ's RFC determination that the plaintiff is capable of performing simple, routine, and repetitive tasks, make simple work-

related decisions, or interact with supervisors, coworkers, or the public." Third, she says the ALJ erred in discrediting her subjective complaints.

### A. Discounting the Opinion of a Treating Physician

"A treating physician's opinion is entitled to controlling weight when it is supported by medically acceptable techniques and is not inconsistent with substantial evidence in the record." *Schwandt v. Berryhill*, 926 F.3d 1004, 1011 (8th Cir. 2019); *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).[2] "Even if not entitled to controlling weight, such opinions typically are entitled to at least substantial weight, but may be given limited weight if they are <u>conclusory</u> or <u>inconsistent with the record</u>." *Schwandt,* 926 F.3d at 1011 (emphasis added). When controlling weight is not assigned, the ALJ assigns an otherwise appropriate weight by considering the length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion, whether the treating source is a specialist, and other factors tending to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2)(i)-(ii), (3)-(6); 416.927(c)(2)(i)-(ii), (3)-(6).

Here, the ALJ discounted Ardekani's conclusions that came in the form of a mental residual functional capacity questionnaire ("MRFCQ") completed on November 7, 2017. (Tr. 339-343). In the MRFCQ, Ardekani marked 54 of 56 "signs and symptoms"

---

[2] Baker filed her claims before March 27, 2017. Had she filed her claims after that date, 20 C.F.R. §§ 404.1520c and 416.920c would have applied, which changes the method of evaluating a physician's opinions away from assigning specific weight. *See Bankhead v. Berryhill*, 2019 WL 183970 at *5 n.5 (E.D. Mo. Jan. 14, 2019) (noting an abandonment of the "assigned-weight regime" in favor of a new "persuasiveness-of-the-evidence regime").

listed in the questionnaire, including everything from “thoughts of suicide” and “inflated self-esteem,” to “autonomic hyperactivity” and “deeply ingrained, maladaptive patterns of behavior.” (Tr. 340). In several functional categories, he checked boxes indicating Baker is either “seriously limited” or else “unable to meet competitive standards.” (Tr. 341-342). For example, he checked a box saying that Baker was seriously limited in her ability to interact with the general public; he also checked a box saying Baker is unable to meet competitive standards when it comes to “deal[ing] with normal work stress.” (Tr. 341-342). Ardekani listed his “frequency and length of contact” as simply “two months” with an illegible symbol preceding it—presumably meaning every two months, which is consistent with treatment records. (Tr. 339). His overall prognosis was “poor, chronic, permanently disabled.” (Tr. 339). He ultimately concluded Baker would likely miss more than four days of work per month due to her mental impairments. (Tr. 343).

Notably, both parties’ briefs omit one important fact: the MRFCQ says that the “earliest date that the above description of limitations applies” is “now”—meaning November 7, 2017, when the questionnaire was completed by Ardekani. Thus, the alleged onset of “chronic, permanently disabl[ing]” symptoms comes almost two years after Baker’s initial application date. (Tr. 143-153, 339). It, therefore, has mitigated effect by reason of this timing limitation alone. *See, e.g., Al Rubaee v. Saul*, 2019 WL 4695882 at *4 (E.D. Mo. Sept. 26, 2019) (noting the “mitigated effect” of a medical source statement that applied to a short period and only years after the application date).

In any event, this Court also agrees with the ALJ that the MRFCQ, no matter its scope of applicability, is “inconsistent with the medical evidence of record.” (Tr. 20).

Ardekani has seen Baker for a very long time—Baker says "over 20 years"—and, yet, in the vast majority of his bi-monthly treatment notes, the observations and impressions are benign. To be sure, Ardekani's notes consistently document normal-to-near-normal mental examinations, including good judgment, cohesive thoughts, normal speech, and focused attention/concentration. (Tr. 271-273, 278-280, 288, 311-312, 314, 316, 318, 320, 326, 328, 330, 332, 334, 350-52, 354-357). Many notes repeat, verbatim, Ardekani's diagnoses without any change in language whatsoever despite many months between visits. In fact, from February 2, 2016, to November 6, 2017, both the 16 "subjective" impressions and 13 "objective" impressions are exactly the same—demonstrating either remarkable stability in Baker's conditions or, else, inattentive notetaking on the part of Ardekani. (Tr. 311-334). In each such case, Baker's mood is "fair," her anxiety "low," her sleep, appetite, and energy "good," her attention and concentration "focused," her demeanor "calm," her eye contact "good," her motor exam "grossly normal," her speech "normal," her thoughts "cohesive," her affect "euthymic," her insight and judgment "good," her consciousness "alert," and her memory "immediate." (*Id.*).

Baker's daily activities are also inconsistent with the "permanent disability" urged by the MRFCQ. When asked by the ALJ "in [her] own words what keeps [her] from going to work," Baker said she has "social anxiety[,] can't follow directions … [and] suffer[s] from depression." (Tr. 39). Baker did not mention struggling with other symptoms included in the MRFCQ, such as having catatonic behavior. (Tr. 340). Baker says she hasn't worked since 1998 and was on "mental disability" until 2015 when she was "cut off." (Tr. 39). However, despite the social anxiety she suffers, in 2012 she met

her current boyfriend after apparently asking him to fix her fence while he was working next door. (Tr. 41). They went canoeing in 2013. (Tr. 41). And since her alleged onset of mental disability in 1998, Baker says she is capable of preparing her own food, does laundry, dresses herself, can drive, takes her own showers (but needs reminders from her daughter), washes dishes, does some minimal level of mopping, sweeping, and vacuuming, cares for three dogs, has hunted for mushrooms in the past (though required her asthma inhaler), cuts the grass (in quarter sections with periodic rest due to respiratory issues), shops for groceries, watches television (the "Price is Right"), and engages social media to see that "other people are fine." (Tr. 43-48, 178-181). In fact, at times Baker's testimony is undercut by Ardekani's notes. For example, Baker suggested to the ALJ that she has not been able to travel beyond a 50-mile radius since November 2015, yet Ardekani's treatment notes from September 2015 mention a planned week-long vacation (apparently in Arkansas) between Baker and her boyfriend in which she was specifically discharged from "IOP" so that she could attend the trip. (Tr. 42, 264, 673, 692). So, while Baker appears to have responded to the ALJ truthfully as a technical matter, Ardekani's notes undercut Baker's suggestion in her application material that she's been totally disabled since at least 1998 with no positive change in her symptoms. (Tr. 187). It also undercuts the MRFCQ's suggestion that Baker is "seriously limited" in her ability to travel. (Tr. 342).

    Elsewhere, the record contradicts the testimony and restrictions urged by Baker that were relied upon by Ardekani in his long-term observations of her. In one example, Baker—and Ardekani—emphasize the extreme social anxiety Baker has, which she says

forces her to stay mostly in her bedroom; yet, other providers mention how Baker is "delightful" and "social with staff and peers." (Tr. 180, 183 281, 371, 376, 726). In fact, Baker apparently told a different provider how she was excited to attend a Kid Rock concert, Bass Pro Shop, and Sam's Club with her family. (Tr. 646, 664). In 2015, Baker also reported going to the gym and doing volunteer work. (Tr. 673). In another example, Baker says she's "NEVER been on a computer" (emphasis in original) and doesn't listen to music—essentially indicating she has no hobbies—but later admitted to playing on social media "a couple times a week" and using music to distract her mind. (Tr 47-48, 181, 655). And in a final example, the MRFCQ suggests Baker is "grossly disorganized," yet Baker tells other providers how she can "get overly involved with a list. She can make a list for a list." (Tr. 340, 647). The MRFCQ does not make clear how it was able to filter out these, and other, embellishments and/or inconsistencies.

To be sure, much of Baker's anxiety appears to be driven by the fact that she was "worried about her social security benefits and the possibility of being told [s]he must work" after, in her words, being "cut off" from disability in 2015—in fact, this was a prevailing theme throughout her medical records. (Tr. 39, 187, 253, 262, 264, 274, 287, 369, 372, 377-378, 438, 441, 577, 595, 611, 648, 674, 689, 695). She was worried that "she has no skills" if she were to be forced back to work. (Tr. 692). In one case, treatment notes mention that Baker tried vocational rehabilitation only to conclude "she has nothing without social security" and that, should she not regain it, "she will be 'done' and will need to take the rest of the family out because their lives would be done too." (Tr. 262). Apparently, Baker's boyfriend was also "hurt" by her loss of disability benefits. (Tr.

695). And Baker, herself, "seem[ed] fixated on 'how a stranger could make this decision about her entire life.'" (Tr. 727). Health providers, meanwhile, would sometime suggest that Baker was being suspiciously "dramatic," and "able to easily come across as depressed [and] then change her affect back again." (Tr. 369). They would also encourage her to tell the truth and "be[] more honest" to her family and others. (Tr. 673, 683). On one occasion, Baker even stated that "Ardekani helped her get disability in the 1990's," a point Ardekani admits in his notes (Tr. 369, 706). In Ardekani's own words, he acknowledges "medication had been helping [Baker's symptoms] until she received the letter from [the] social security office that was unfavorable." (Tr. 706). Beyond these issues, there are also periodic references to drug and alcohol abuse following Baker's initial disability determination in 1998, with symptomatic improvements following a "cut down" of both substances around 2013. (Tr. 717). Taken as a whole, Baker's symptoms appear predominately situational—with various notes mentioning "significant" improvement and positive demeanor after treatment, medication, therapy, and time. (Tr. 256, 259-260, 268, 270, 281, 368, 371-372, 377, 439, 664, 690, 692, 695, 705, 717, 721).

Considering the record in total, this Court holds the ALJ did not err in giving Ardekani's MRFCQ "little weight." Questionnaire-based conclusions from a treating physician may be discounted where the total record does not support them. *See Fellner v. Saul*, 2019 WL 4141025 at *5-6 (E.D. Mo. Aug. 30, 2019). This is particularly true where the questionnaire is conclusory, cites no medical evidence, and provides little-to-no elaboration—as is the case here. *Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018). Therefore, while Baker and her treating physician, Ardekani, both urge a finding

of profound mental disorders affecting Baker's social capabilities, her inconsistent daily activities, contrary treatment notes from other providers, and Ardekani's own incongruous observations supply the ALJ with ample ground to exercise discretion in discounting the at-issue MRFCQ. *See Schwandt*, 926 F.3d at 1011 (ALJ properly discounted treating physician's conclusions that were at odds with other providers and claimant's daily activities); *Despain v. Berryhill*, 926 F.3d 1024, 1028 (8th Cir. 2019) (ALJ appropriately discounted the conclusory opinions of a treating physician to the extent their opinion "went beyond the submitted records"); *Adkins v. Comm'r, Soc. Sec. Admin*., 911 F.3d 547, 550 (8th Cir. 2018) (ALJ appropriately discounted treating physician's opinions in questionnaire where they were inconsistent with treatment notes and where limitations in questionnaire were never mentioned elsewhere in treatment records).

**B. Evidence Supporting the ALJ's RFC Determinations**

Baker says she cannot perform simple, routine, and repetitive tasks, make simple work-related decisions, or interact with others—arguing no evidence to the contrary can be found in the record. Thus, she says, the ALJ erroneous "formed her own opinion[s]" on those points rather than rely on the record.

This Court disagrees. The record outlined above—from Baker's daily activities to the observations of various providers—makes clear that Baker is not so limited as she otherwise suggests. She alleges she cannot interact with others, yet she is described as "delightful," "social with staff and peers," and admits to participating in volunteer work, going to rock concerts, various crowded retailer outlets, the gym, and traveling on

vacation with her boyfriend. (Tr. 180, 183, 264, 281, 371, 376, 646, 664, 673, 692, 726). It is also notable that, while purportedly experiencing marked social disturbances that forces her to remain mostly in her bedroom, she was nonetheless capable of striking up a conversation (leading to a canoeing-related date) with her current boyfriend as he worked at a neighbor's house. (Tr. 41, 180). She also alleges that she cannot perform simple, routine tasks or make simple decisions, yet her own long-term physician calls her thoughts "cohesive," her memory "immediate," her attention and concentration "focused," and her insight and judgment "good." (Tr. 311-334). These observations comport with her daily activities, in which she is able to do everything from laundry, shopping, and driving herself around, to household chores, caring for pets, hunting for mushrooms, and cutting the grass. (Tr. 43-48, 178-181).

The ALJ captured the social limitations Baker has by limiting her contact to "frequently" with supervisors and "occasionally" with coworkers and the public. The ALJ further captured the complexity of tasks Baker is capable of performing by limiting her to simple, routine, and repetitive tasks—concordant with the daily activities Baker is able to accomplish at home. That Baker may be able to point to limited contrary evidence in the record—such as aberrant, situation-dependent moments of mental instability—is of no consequence. Baker's RFC is, when considered under the total record, well-supported and goes as far as the record allows. As the Eighth Circuit explained it, the RFC "lies [within] the available zone of choice." *Twyford v. Comm'r, Soc. Sec. Admin*., 929 F.3d 512, 517-518 (8th Cir. 2019) (RFC lied within "zone of choice," even if one could argue that the records supported a more restrictive RFC than was determined by the ALJ); *see*

*also Fentress v. Berryhill*, 854 F.3d 1016, 1021 (8th Cir. 2017) (RFC was appropriate, despite claimant's ability to point to contrary evidence in the record, where "good reasons and substantial evidence on the record as a whole" supported ALJ's conclusions). Thus, the ALJ did not err in formulating Baker's RFC.

**C. Discounting Claimant's Subjective Complaints**

For her final challenge, Baker says the ALJ erred in "complete[ly] dismiss[ing]" her "written opinion[s]" about her social and physical limitations. "While an ALJ is not free to disregard subjective complaints merely because there is no other evidence in support of the complaints, he may choose to disbelieve those subjective reports because there are *inherent inconsistencies or other circumstances* that cause the ALJ to question the reliability of the subjective reports." *Twyford*, 929 F.3d at 517-518 (emphasis added).

Baker points to her own self-assessments in a "functional report" she completed in January 2016 after she lost her disability benefits in 2015. (Tr. 177-184). That report suggests Baker suffers from profound mental disabilities. Baker says she's "completely parinod (sic) of everything," has "extreme rage," has no "hobbys (sic) or intrests (sic)," is subject to "severe panic attacks," and is, thus, forced to "rarely even leave [her] bedroom." (*Id.*). But, as this Court has already pointed to, the total record does not comport with these limitations. The record provides ample room for the ALJ to disbelieve Baker based on contrary daily activities and provider observations. *Schwandt*, 926 F.3d at 1012 (ALJ appropriately discounted subject complaints of disabling pain where objective evidence undermined claimant's testimony via examinations that shows full range of motion, good stability, and low subjective pain remarks); *Nash v. Comm'r, Soc. Sec.*

*Admin.*, 907 F.3d 1086, 1090 (8th Cir. 2018) (ALJ did not err in finding claimant's subjective complaints "not entirely credible" where daily activities contravened claimant's self-assessed restrictions); *Perks v. Astrue*, 687 F.3d 1086, 1093 (8th Cir. 2012) (ALJ properly discounted the overstated severity of claimant's pain where it was not in accordance with treatment notes and daily activities). Moreover, Baker's near-obsessive focus on retaining her disability benefits after losing them months before the report was completed—a focus that resulted in suicidal ideations, threats towards her family members, and a period of hospitalization—provides further reason for the ALJ to carefully consider the motivations Baker had in completing the report with a possible tendency towards embellishment. *Cf. Aguiniga v. Colvin*, 833 F.3d 896, 902 (8th Cir. 2016) (ALJ correctly discounted subjective complaints where claimant appeared motivated to seek treatment only in furtherance of disability claims); *Julin v. Colvin*, 826 F.3d 1082, 1087 (8th Cir. 2016) (ALJ correctly relied on evidence that claimant lacked a motivation to work as reason to discount her credibility). In sum, this Court concludes the ALJ did not err in discounting Baker's subjective complaints.

## VI. Conclusion

This Court's review is limited to determining whether the ALJ's findings are based on correct legal standards and supported by substantial evidence. It does not substitute its own judgment for that of the ALJ. *Gann v. Berryhill*, 864 F.3d 947, 950 (8th Cir. 2017). Having found the ALJ's conclusions were supported by substantial evidence and that legal standards were correctly applied, this Court affirms the ALJ's decision.

Accordingly,

**IT IS HEREBY ORDERED** that the Commissioner's decision is **AFFIRMED** and plaintiff Dina Baker's complaint (ECF #1) is **DISMISSED with prejudice**. A separate judgment will accompany this Order.

So ordered this 27th day of December 2019.

                                                STEPHEN N. LIMBAUGH, JR.
                                                UNITED STATES DISTRICT JUDGE